# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| JEFFREY SIMPSON, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:19-cv-17 |
| v. | ) |
| | ) |
| NORFOLK SOUTHERN | ) |
| RAILROAD COMPANY, | ) By: Hon. Michael F. Urbanski |
| | ) Chief United States District Judge |
| Defendant | ) |

## MEMORANDUM OPINION

Jeffrey Simpson filed this lawsuit on March 28, 2019, alleging that he was injured on the job while working as a conductor for Norfolk Southern Railroad Company (NSRC). First Am. Compl., ECF No. 34.[1] He seeks relief under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60 (FELA) and the Federal Safety Appliance Act, 49 U.S.C. § 20302(a)(1)(B) (SAA). Pending are Simpson's motion for partial summary judgment, ECF No. 38, and NSRC's motion for summary judgment, ECF No. 43. Responses to each motion have been filed and the issues have been fully briefed. In addition, a hearing was held in this matter on June 22, 2020. For the reasons discussed more fully below, Simpson's motion is **GRANTED**, and NSRC's motion is **DENIED**.

## BACKGROUND

On October 29, 2018, Simpson, a railroad conductor, and Darrell Pitman, a locomotive engineer, were working as a two-person transportation crew assigned to assemble a train of

---

[1] Simpson originally also brought a negligence claim under the FELA but has since abandoned it. See Pl.'s Brief in Support of Mot. for Summ. J., ECF No. 39 at 1-2.

empty coal cars at the Andover yard in Appalachia, Virginia. The train consisted of three engines and sixty cars. The cars were stored on three tracks in the yard, with 30 cars coming from Track 14, two cars coming from Track 9, and twenty-eight cars coming from Track 11. The train was assembled on Track 11, a mainline track, and at this point the train was "solid," meaning the cars were all coupled together and the switching movements were complete. All Simpson and Pitman had left to do was perform a brake test and depart.

After assembling the cars, Simpson told Pitman to pull the cars east and Simpson placed an end-of-train device (EOTD) on the last car. Among other things, the EOTD shows that the air for the train brakes is connected throughout the car. Simpson was driven to the front of the train and then began walking back west to inspect the train. Before beginning his inspection, Simpson asked Pitman to shove the train back west two or three feet. Simpson noticed that two of the cars had snug brake chains and one car had a hand brake that was still fully applied. He loosened the two snug chains.

The car that had the hand brake fully applied was identified as NS 146689 and was approximately the fifteenth car back from the engines. It was stopped on a culvert over a small creek, with the top of the culvert six feet, seven inches above the creek bed. In order to release the hand brake, Simpson used his radio to request three-step protection, which is a protocol to ensure that the train does not move. Simpson tried to release the hand brake with his brake stick and did not use the quick release lever. Simpson reported that when he first pulled on the brake wheel it would not turn, and when he pulled it again with greater force, it "broke loose" with "no resistance," causing Simpson to lose his balance and fall off the culvert into the shallow creek below.

Although Simpson has little memory of what happened after that, he managed to use his radio to call for help. A co-worker found him and called for emergency services and Simpson was transported via helicopter to the hospital. He suffered a torn rotator cuff in his right shoulder, has bilateral hip pain, PTSD, vision difficulties, anxiety, and depression.

The only issue to be decided at this point in the litigation is whether the rail car was "in use" at the time Simpson was injured. If the car was "in use," Simpson may proceed with his lawsuit. If the car was not "in use," summary judgment will be entered for NSRC.

**I. Cross Motions for Summary Judgment**

This case is before the court on cross-motions for summary judgment. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The

3

moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment

unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

Both cross-motions in this case address the issue of whether the railcar was "in use" at the time Simpson was injured. However, for purposes of this motion, there are no contested fact issues.

## II. FELA and SAA

"Section 1 of FELA provides that '[e]very common carrier by railroad … shall be liable in damages to any person suffering injury while he is employed by such carrier … for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier.'" Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 542 (1994) (quoting 45 U.S.C. § 51). "[W]hen Congress enacted FELA in 1908, its 'attention was focused primarily upon injuries and death resulting from accidents on interstate railroads.'" Id. (citing Urie v. Thompson, 337 U.S. 163, 181 (1949)). "Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress drafted a federal remedy that shifted part of the 'human overhead' of doing business from employees to their employers." Id. (citing Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54 (1949)). Courts liberally construe FELA to further Congress' remedial goal. Id. at 543. In discussing the Boiler Inspection Act,[2] the Fourth Circuit commented that "the intent of the statute is to exclude from its coverage only such functions as are necessary to detect and

---

[2] "[B]ecause the "in use" language in the Boiler Inspection Act is identical to the language in the [SAA], courts have applied caselaw interpreting the Boiler Inspection Act to the [SAA], as well." Phillips, 190 F.3d at 288, n. 2.

5

correct those defective conditions for which absolute liability will be imposed." Angell v. Chesapeake and O. Ry. Co., 618 F.3d 260, 262 (4th Cir. 1980).

The SAA, which imposes safety requirements on railroads, makes it unlawful for a railroad to use railcars that are not equipped with certain mandated safety features, including hand brakes. 49 U.S.C. § 20302(a). The SAA does not create an independent cause of action for those injured because of a violation of the act, but "for railroad employees injured because of a SAA violation, FELA provides the cause of action." Phillips v. CSX Transp., Inc., 190 F.3d 285, 288 (4th Cir. 1999) (per curiam). In addition, a SAA violation is per se negligence in a FELA suit. "In other words, the injured employee has to show only that the railroad violated the SAA, and the railroad is strictly liable for any injury resulting from the violation." Id.

### III. The "in use" Test

The SAA safety requirements apply only to railcars that are actually "in use." Phillips, 190 F.3d at 288. "[T]he purpose of the "in use" limitation is to give railcar operators the opportunity to inspect for and correct safety appliance defects before the SAA exposes the operators to strict liability for such defects." Id. For purposes of the SAA, the question of whether a train is "in use" is a question of law for the court to decide. Id.

#### A. The Multi-Factor Test

In Deans v. CSX Transp. Inc., 152 F.3d 326 (4th Cir. 1998), the Fourth Circuit looked at how a court determines whether a railcar is "in use" for purposes of the SAA. Deans was working as a conductor and he and an engineer were assigned to take a train from West Virginia to Maryland. When Deans arrived at the railyard, the cars making up the train were already coupled together, but before the train could leave, Deans had to couple the engines to

6

the railcars, release the hand brakes that were on the railcars, and conduct a pre-departure air brake test. Id. at 328. Deans completed the first task and prior to conducting the air brake test, attempted to release the hand brakes. He released one or two hand brakes without incident, but when he attempted to release another brake, it was stuck. He gave the brake a hard pull, which still did not release it, but caused him pain in his neck and spine. Id.

Deans filed suit under the SAA, alleging permanent back and neck injuries, and the district court granted summary judgment to the defendant after finding that the railcar was not "in use." The district court concluded that because the air brake test had yet to be completed when Dean was injured and no movement was imminent, the train was not "in use" at the time of the accident. Id. at 329.

The Fourth Circuit reversed. The court found that although the district court sought to draw a useful and practical distinction between trains which had completed pre-departure inspections and been approved for service, with those for which pre-departure tests had not been completed, such a test was too facile to accurately reflect the multitude of steps required, and the various sequences in which the steps could be taken, to prepare a train for departure. Id. Because it is permissible to test the air brakes first and then release the hand brake, under the district court's analysis, the train would have been "in use" if Deans had decided to release the hand brakes before testing the air brakes. The court found that it was inappropriate to base liability under the SAA on the mere happenstance of whether an employee chooses to conduct the air brake test or release the hand brakes first. Id.

The appellate court found that rather than a bright-line test, it was better to look at a number of different factors, such as the location of the train at the time of the accident and

the activity of the injured party. Id. Applying those factors, the court noted that although the train had not yet begun moving on the main track, it already had its engine coupled to it and was "standing on a track in the rail yard in preparation for imminent departure—not in storage or waiting to be moved to a repair location." Id. at 330.

The court next found that Deans, as conductor, was part of the transportation crew and not involved in the repair or maintenance of the train. He was attempting to put the train in motion when he was injured, which was part of his duties. The fact that the air brake test still needed to be completed was not dispositive. Id. Thus, the court concluded that the train was "in use" at the time Deans was injured. Id.

In Phillips, the court applied the Deans factors to find that a railcar was not "in use" at the time a brakeman was injured. Phillips was a member of a yard crew engaged in normal train switching operations, which consist of taking arriving trains apart and putting departing trains together. Phillips, 190 F.3d at 286. The yard crew disconnects the train's cars from one another and turns them over to the car department for a mechanical inspection. Once the inspection is complete, the car department turns the cars back over to the yard crew, which assembles the cars into new trains for departure. Before a train can depart, it undergoes a pre-departure inspection, conducted by the car department. The yard crew engages the hand brakes on the cars in an assembled train, detaches the engine, and turns the car back to the car department for the inspection. When the inspection is complete, the car department turns the train over to the transportation crew, and the train departs. Id. at 287.

Phillips was injured while he was setting the hand brake on a completed train, before turning it back to the car department for its predeparture inspection. Id. The court noted that

the SAA applies more broadly than simply to trains traveling from their origin to their destination on mainline tracks. It applies to a transfer train moving on a short connecting track from one yard to another, and a train that has reached its destination but has not yet been turned over to the yard receiving it is "in use" under the SAA. Id. at 288-289 (citing cases).

Applying the Deans factors, the court found that the train on which Phillips was injured was not "in use" because the train was about to be uncoupled from its engine, its hand brakes were being engaged to prevent it from moving, and it had not undergone its predeparture inspection. In addition, Deans was a member of the train's transportation crew while Phillips was a member of the yard crew, and his responsibilities were limited to switching operations. Deans was injured as he released the hand brakes, while Phillips was injured as he engaged the hand brake to keep the train from moving. Finally, Deans could have released the hand brakes after the predeparture inspection, but Phillips had to engage the hand brakes prior to the predeparture inspection, in conjunction with the assembly of the train. The court concluded that Phillips was injured at the end of the switching process rather than at the beginning of the departure process, and thus the train was not "in use" at the time of his injury. Id. at 290.

District courts in the Fourth Circuit apply Deans and Phillips to determine whether a car is "in use" in FELA cases. In Miller v. CSX Transp., No. 2:06-0113, 2007 WL 1094389 (S.D. W.Va. 2007),[3] the district court applied the Deans factors to find that a locomotive was not "in use" at the time of the plaintiff's accident, because the plaintiff was not part of the transportation crew and it was clear that while the locomotive's departure might have been

---

[3] Miller's claim was brought under the Federal Locomotive Inspection Act (LIA) rather than the SAA, but the "in use" analysis is the same. Miller, 2007 WL 1094389 at *3, n. 1.

9

eventual, it was not imminent. Id. at *3. The court in Williams v. Norfolk Southern Ry. Co., 126 F.Supp.2d 986 (2000), applied Deans and Phillips to find that a car was "in use" at the time of a plaintiff's accident. There, the railcar was located on the defendant's road at the time of the accident. It was not awaiting inspection of its safety appliances, repair, or storage and it was manned by the transportation crew. Id. at 991. Williams was the conductor of the transportation crew and his job was to retrieve loaded coal cars from the customer mine and move them to one of the defendant's yards. He was injured trying to release the hand brake in order to put the train in motion. Id. The court found that under Deans, these factors weighed in favor of finding that the railcar was "in use" when Williams was injured. In addition, the court found that its conclusion was buttressed by the policy considerations set out in Phillips, that the "in use" limitation gives railcar operators an opportunity to inspect for and correct safety appliance defects before the SAA exposes operators to strict liability for such defects. Id. at 991-992 (citing Phillips, 190 F.3d at 288).

Simpson argues that his case falls squarely within the holding of Deans, because he was a conductor working as part of a transportation crew preparing a fully assembled train for imminent departure on mainline tracks. There were no repairs or maintenance to be done and he was attempting to release the hand brake to allow the train to depart the yard. After releasing the hand brake, his only remaining task would have been to perform a predeparture air brake test and finish visually inspecting the train in accordance with Rule C-100.[4]

---

[4] Rule C-100 describes the conditions to be inspected by the train crew. See Ex. 1 to Plaintiff's Mot. to Dism., ECF No. 39-1 at 2.

10

NSRC counters that this case is different from <u>Deans</u> because in performing this job, the crew normally assembles the train and then conducts the brake test. Because the cars are not supposed to be moved without releasing the hand brakes, the hand brakes should have been released before the brake test was performed. The normal procedure was to release the hand brakes, assemble the train, and then do the brake test, and NSRC argues that the sequence of events was not happenstance as it was in <u>Deans</u>.

In support of this argument, NSRC relies on the declaration of Thomas Michael Hamm, ECF No. 44-1. Hamm is the terminal superintendent for NSRC and investigated the incident involving Simpson. Hamm stated the following:

> It is possible to conduct a brake test before releasing the hand brakes and before moving the cars, but that would not be a normal or practical way of performing this job. The normal and practical way of performing the job would be to assemble all the cars and then do the brake test, which is what Simpson was doing. In this case, however, Simpson did not release all the brakes before moving the cars. As a result, the hand brake on NS 146689 was apparently still on when Simpson started doing the brake test.

Hamm Depo., ECF No. 44-1, ¶ 7. NSRC does not explain how this procedure affects the "in use" analysis in <u>Deans</u>. According to the statement, Simpson was performing the job in the normal and practical way, but allegedly did not release all the brakes before moving the cars. NSRC argues that because there was a normal and practical way to do the job, a variation from that procedure cannot be "happenstance." However, the argument misses the central holding in <u>Deans</u> that a consistent and fair result is reached "by looking at a number of different factors, rather than simply at the completion or noncompletion of pre-departure tests," and that the primary factors are where the train was located at the time of the accident and the activity of the injured party. <u>Deans</u>, 152 F.3d at 229.

11

Applying Deans to this case leads to the conclusion that the car was "in use" at the time of the incident. The train was on the mainline and Simpson was performing the last tasks that needed to be completed before the train's imminent departure. Like Deans, Simpson was the conductor of the transportation crew and was not performing service, maintenance or repairs. In addition, a finding that the car was "in use" is consistent with Phillips, which highlighted the difference in activities at the beginning of the departure process with those as the end of the switching process. Phillips, 190 F.3d at 289-290. Applying the multi-factor test set forth in Deans and reinforced by Phillips, the court finds that the car was "in use" at the time Simpson was injured.

**B. The Effect of 49 C.F.R. § 232.9(a)**

In 2001, after Deans was decided, the Federal Railroad Administration (FRA) published a new section of the Brake System Safety Standards and NSRC argues that it abrogates the "in use" analysis set forth in Deans. The regulation states the following:

> A railroad subject to this part shall not use, haul, permit to be used or hauled on its line, offer in interchange, or accept in interchange any train, railroad car, or locomotive with one or more conditions not in compliance with this part; however, a railroad shall not be liable for a civil penalty for such action if such action is in accordance with § 232.15.[5] For purposes of this part, a train, railroad car, or locomotive will be considered in use prior to departure but after it has received, or should have received, the inspection required for movement and is deemed ready for service.

49 C.F.R. § 232.9(a). NSRC contends that this regulation defines "in use" to mean that for purposes of the SAA, a car is not in use until after it has received, or should have received, the required inspections and has been deemed ready for service. In particular, Section 232.205

---

[5] Section 232.15 addresses movement of defective equipment.

12

requires that each train and each car shall receive a Class I brake test at the location where the train is originally assembled. 49 U.S.C. § 232.205(a)(1). The inspection includes an inspection of each side of each car and an examination of all moving parts of the brake system. 49 U.S.C. § 232.205(c)(2). Because that test had not occurred at the time Simpson was injured, NSRC asserts that the car was not "in use" at the time he was injured.

Only two cases were found which address the issue of whether Section 232.9(a) affects the Deans and Phillips analyses of "in use" for purposes of the SAA, this court being one of them, albeit not directly. In Brall v. Norfolk Southern Railway Co., No. 2:17-cv-00017, 2018 WL 2144612 (W.D. Va. 2018), a train conductor alleged that he was injured when he slipped and fell, striking his head on the nose of the engine and landing hard on his buttocks on the walkway. Id. at *1. He sought relief under the FELA and the Locomotive Inspection Act (LIA)[6], which would establish strict liability under the FELA.

As under the SAA, a plaintiff may establish negligence per se by demonstrating that the railroad violated the LIA. Id. at *3 (citations omitted). The court noted that although Deans was decided under the SAA, courts have applied case law interpreting the LIA to the SAA. Id. (citing Phillips, 190 F.3d at 288 n. 2). The court then found that the Deans factors were met and held that the locomotive was "in use" under the LIA. Id. at *5.

---

[6] The LIA provides in relevant part the following:
A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances –
    (1) are in proper condition and safe to operate without unnecessary danger of personal injury—
    (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
    (3) can withstand every test prescribed by the Secretary under this chapter.
49 U.S.C. § 20701.

13

As in this case, NSRC urged the court in Brall to find that Section 232.9 abrogated the Deans test and established a new definition of "in use" for SAA and LIA claims. This court declined to do so, first finding that the FRA promulgated Section 232.9 under the SAA and not the LIA. Id. at *6. While this conclusion might appear to open the door to a finding that because Simpson is proceeding under the SAA rather than the LIA, Section 232.9 abrogates Deans, the Brall decision did not go that far.

Rather, while the court concluded that Section 232.9's "in use" definition only applied for purposes of part 232, which implicates the SAA, the court did not further address the effect of the regulation on the "in use" test in SAA cases. The court did note that it had found multiple post-Section 232.9 SAA cases that continued to apply Deans to determine the "in use" issue, both in LIA cases and SAA cases. The court cited Kobe v. Canadian Nat'l Ry. Co., Civ. No. 06-3439 (RHK/RLE), 2007 WL 2746640 at *5 (D. Minn. 2007) and Underhill v. CSX Transp. Inc., No. 1:05-CV-196-TS, 2006 WL 1128619 at *5 (N.D. Ind. 2006), both of which were decided after promulgation of Section 232.9 and adopted the Deans multifactor test for determining whether a rail vehicle was in use in a SAA case.[7]

The court also looked at Clark v. Norfolk Southern Railway Co., Civ. No. 12-C-222 (Cir. Ct. Mingo Cnty. W.V. Sept. 21, 2015), an unpublished West Virginia State Court opinion, where that court applied the bright-line rule suggested by Section 232.9 in an SAA civil liability case. However, the court in Brall declined to follow the Clark decision, in part because it was

---

[7] Plaintiff cited additional cases decided after promulgation of Section 232.9 that decided the "in use" issue without reference to the regulation. See Ditton v. BNSF Ry. Co., No. CV 12-6932 JGB, 2013 WL 2241766 (C.D. Cal. 2013); Solice v. CSX Transp., Inc., Civil Action No. 11-1288, 2012 WL 1196668 (E.D. La. 2012); Bruno v. CSX Transp. Inc., No. 1:08-cv-867, 2011 WL 13206042 (N.D. N.Y. 2011); and Thomas v Reading, Blue Mountain and No. Ry. Co., No. Civ. A. 01-5843, 2003 WL 21949156 (E.D. Pa. 2003).

the only case cited or found that adopted NSRC's argument that Section 232.9 abrogates the Deans test. Brall, 2018 WL 2144612 at *7.

The court in Brall also looked at the only other case found which cited Section 232.9 in discussing whether its definition of "in use" abrogates Deans, i.e., Nygaard v. BNSF Ry. Co., No. A12-1566, 2013 WL 2460198, *7 n. 4 (Minn. Ct. App. June 10, 2013). Nygaard applied the totality of the circumstances test and commented that Section 232.9 applies only to civil penalties and not civil liabilities for injuries. Brall, 2018 WL 2144612 at *7 (citing Nygaard, 2013 WL 2460198 at *7). Thus, the court in Brall concluded that Nygaard did not support NSRC's position. Id.

NSRC asserts in the instant case that Nygaard was wrongly decided, and that the FRA was not defining "in use" merely for purposes of determining civil penalties but was exercising its authority to define "in use" under the SAA. While NSRC concedes that the regulation does exempt a railroad from liability for civil penalties if it acts in accordance with 49 C.F.R. § 232.15 (allowing the movement of certain defective cars), NSRC argues that the exemption does not limit the definition of "in use" in the regulation.

However, the only authority offered in support of this argument is Clark, which this court previously declined to follow. Considering the issue anew, this court notes that Clark remains the only case found which applies Section 232.9 to abrogate the Deans test. Moreover, it does not appear that the plaintiff in Clark raised the argument that Section 232.9 applies only to situations involving civil penalties rather than civil liability and the court did not address it. See Clark, No. 12-C-222 at 3-5. For these reasons, the court once again declines to follow the holding in Clark.

In addition, the court now affirmatively finds that Section 232.9 does not abrogate the multi-function test set forth in <u>Deans</u>. First, the language of the regulation directly addresses liability for a civil penalty and does not mention civil liability such as that alleged by Simpson. The regulation sets out language reiterating that a railroad shall not use a train, railroad car, or locomotive that is not in compliance with the rules regarding brakes. The regulation then clarifies that a railroad shall not be liable for a civil penalty if the action is taken during the movement of certain defective cars under Section 232.15, implying that if the action is not taken while moving defective cars in accordance with Section 232.15, the railroad shall be liable for a civil penalty. The regulation then states, "for purposes of this part," a train, railroad car, or locomotive will be considered "in use," prior to departure, but after the train has received the required inspections. The court reads the clause "for purposes of this part" as limiting applicability of the regulation to liability for a civil penalty.

This reading of the regulation is supported by the comments published in the Federal Register in connection with the promulgation of Section 232.9, which focused on civil penalties:

> General compliance requirements are contained in [Section 232.9]. In accordance with the "use" or "haul" language previously contained in the Safety Appliance Acts (49 U.S.C. chapter 203), and with FRA's general rulemaking authority under the Federal railroad safety laws, the final rule retains the proposed requirement that any train, railroad car, or locomotive covered by this part will be considered "in use" prior to departure but after it receives or should have received the necessary tests and inspections required for movement. <u>FRA will no longer necessarily wait for a piece of equipment with a power brake defect to be hauled before issuing a violation report and recommending a civil penalty, a practice frequently criticized by the railroads. FRA believes that this approach will increase FRA's ability to prevent the movement of defective equipment that creates a potential safety hazard to both the public and railroad employees.</u> FRA does not feel that this approach increases the railroads' burden

16

> since equipment should not be operated if it is found in defective condition in the pre-departure tests and inspections, unless permitted by the regulations.

Brake System Safety Standards for Freight and Other Non-Passenger Trains and Equipment; End-of-Train Devices, 66 Fed. Reg. 4104, 4149, 2001 WL 37386(F.R.) (Final Rule, Jan. 17, 2001) (emphasis added). This comment indicates that the purpose of the regulation was to clarify when the FRA could issue a violation report and recommend a civil penalty and does not address civil liability.

Moreover, an additional comment indicates that the regulation was intended to broaden, rather than limit, the concept of "in use" for purposes of civil penalties:

> FRA currently interprets the "use" or "haul" language previously contained in the Safety Appliance Acts narrowly to require that a train or car not in compliance with the power brake regulations actually engage in a train movement before a violation under the power brake regulations could be assessed against a railroad. <u>Although this interpretation is in accordance with existing case law, FRA believes that a broader interpretation is possible based upon the case law interpreting the "use" language contained in the Safety Appliance Acts and based upon FRA's general rulemaking authority under the Federal railroad safety laws. Based upon both these authorities, FRA finds that it is not necessary to require that a train or car engaged in a train movement prior to FRA assessing a violation under the power brake regulations.</u> The fact that the train or car is being used by a railroad, has been or should have been inspected by the railroad, and will be engaged in a train movement while in non-compliance with the requirements contained in this part is sufficient to allow a violation to be assessed.

Id. (emphasis added). The court finds that this comment lends further support to Simpson's argument that Section 232.9 was not intended either to limit the multi-factor "in use" test or to apply anything other than civil penalties.[8]

---

[8] Simpson advanced an additional argument that Section 232.9 applies only to power brakes and not hand brakes. Given the court's conclusion that Section 232.9 applies only to civil penalties, it does not find it necessary to address Simpson's type-of-brake argument.

17

Finally, to adopt the argument put forth by NSRC would undermine the broad remedial purpose of FELA. As discussed by the Supreme Court in Gottshall, courts liberally construe FELA to further Congress' remedial goal. Gottshall, 512 U.S. at 543. See CSX Transport v. McBride, 564 U.S. 685, 691-692 (2011) (quoting Gottshall, 512 U.S. at 542-543) ("Given the breadth of the phrase 'resulting in whole or in part from the [railroad's] negligence,' and Congress' 'humanitarian' and 'remedial goal[s],' we have recognized that, in comparison to tort litigation at common law, 'a relaxed standard of causation applies under FELA.'"); Kernan v American Dredging Co., 355 U.S. 426, 432 (1958) (citing Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 508-510 (1957) ("[I]t is clear that the general congressional intent was to provide liberal recovery for injured workers, … and it is also clear that Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet the changing conditions and changing concepts of industry's duty toward its workers."); Straub v. BNSF Ry. Co., 909 F.3d 1280, 1283 (10th Cir. 2018) ("Given that Congress intended FELA to be a broad, remedial statute, the Supreme Court has adopted a liberal construction to facilitate Congress's objective of compensating railroad workers who are injured on the job.")

The court finds that NSRC's argument that Section 232.9 abrogated the multi-factor test set forth in Deans is not supported by the language of the regulation itself, or the comments made by the FRA at the time the regulation was promulgated. In addition, to adopt the language of the regulation regarding when a train is "in use" for purposes of determining civil liability under the SAA would be inconsistent with Congress' intent in passing the FELA and the SAA. Finally, the court finds that the railcar, NS 146689, was "in use" based on the

Deans test. Accordingly, the court **GRANTS** Simpson's motion for partial summary judgment and **DENIES** NSRC's motion for summary judgment.

## CONCLUSION

Based on the foregoing, plaintiff Simpson's motion for partial summary judgment, ECF No. 38, is **GRANTED**. Defendant NSRC's motion for summary judgment, ECF No. 43, is **DENIED**.

An appropriate order will be entered.

It is so **ORDERED**.

Entered: July 6, 2020

*/s/ Michael F. Urbanski*

Mike Urbanski
cn=Mike Urbanski, o=US Courts,
ou=Western District of Virginia,
email=mikeu@vawd.uscourts.gov, c=US
2020.07.06 18:01:24 -04'00'

Michael F. Urbanski
Chief United States District Judge